UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

RICK FITZGERALD,                                    Civil Action No.  16-8091

                        Plaintiff,                  **COMPLAINT**

            -against-

THE BONDFACTOR COMPANY LLC,
BUTCHERMARK FINANCIAL                               JURY TRIAL DEMANDED
ADVISORS LLC, GEORGE BUTCHER,
WILLIAM JACOBS, TERRY AGRISS,
JOHN GIBBS, GARY COURSEY,
HONORABLE PETER SHERWOOD,
JEFF HUMBER, TONY BOLAND and
TOMORROW VENTURES 2010 FUND, LLC,

                        Defendants.
-------------------------------------------------------X

Rick Fitzgerald ("Fitzgerald"), by his attorneys Hogan & Cassell, LLP, hereby brings this

Complaint against the BondFactor Company LLC ("BondFactor"); ButcherMark Financial

Advisors LLC ("ButcherMark"); George Butcher ("Butcher"); William Jacobs ("Jacobs"); Terry

Agriss ("Agriss"); John Gibbs ("Gibbs"); Gary Coursey ("Coursey"); Peter Sherwood

("Sherwood"); Jeff Humber ("Humber"); Tony Boland ("Boland") and Tomorrow Ventures

2010 Fund, LLC ("TV 2010 Fund") (collectively "Defendants"), for violation of the anti-

retaliation provisions of the Dodd-Frank Act of 2010, 15 U.S.C.A. § 78u-6 ("Dodd-Frank").

### Preliminary Statement

1.      This action arises out of Defendants' termination of the employment of Fitzgerald

because of his reporting of securities law violations at BondFactor.  Defendants terminated the

employment of Fitzgerald for his "whistleblowing" activities and are therefore liable under

Dodd-Frank.  Fitzgerald is entitled to reinstatement with the same seniority status that he would

have had, but for the retaliation; two (2) times the amount of back pay otherwise owed to him,

with interest; and compensation for litigation costs, expert witness fees, and reasonable attorneys' fees.

<u>The Parties</u>

2.       Fitzgerald is an individual who resides at 9602 Sloane Street, Orlando, Florida 32827.

3.       Upon information and belief, the defendant BondFactor is a Delaware limited liability company authorized to do and doing business in the State of New York.  BondFactor's last known principal place of business is 1120 Avenue of the Americas, New York, NY 10036.

4.       Upon information and belief, the defendant ButcherMark is a Delaware limited liability company authorized to do and doing business in the State of New York.  ButcherMark's last known principal place of business is 1120 Avenue of the Americas, New York, NY 10036.

5.       Upon information and belief, the defendant Butcher is an individual over the age of eighteen residing at 310 Oxford Road, New Rochelle, New York 10804.  Butcher is the board chairman and chief executive officer of BondFactor and the chief executive officer of ButcherMark.

6.       Upon information and belief, the defendant Jacobs is an individual over the age of eighteen residing at 507 Groton Avenue, Cortlandt Manor, New York 10567 and as of November 15, 2013 was a member of the BondFactor's board of managers.

7.       Upon information and belief, the defendant Agriss is an individual over the age of eighteen residing at 24 East 7th Street, Apt. 6a, New York, New York 10003 and as of November 15, 2013 was a member of the BondFactor's board of managers.

8.      Upon information and belief, the defendant Gibbs is an individual over the age of eighteen residing at 7027 Twin Hills Terrace, Lakewood Ranch, Florida 43202 and as of November 15, 2013 was a member of the BondFactor's board of managers.

9.      Upon information and belief, the defendant Coursey is an individual over the age of eighteen with a business address of c/o TV 2010 Fund, 555 Bryant Street, Palo Alto, California 94301 and as of November 15, 2013 was a member of the BondFactor's board of managers.

10.     Upon information and belief, the defendant Sherwood is an individual over the age of eighteen residing at 22 The Crossing, Purchase, New York 20577 and as of November 15, 2013 was a member of the BondFactor's board of managers.

11.     Upon information and belief, the defendant Humber is an individual over the age of eighteen residing at 829 East Capitol Street, Washington, D.C. 20003 and as of November 15, 2013 was a member of the BondFactor's board of managers.

12.     Upon information and belief, the defendant Boland is an individual over the age of eighteen with a business address of c/o Choate, Hall & Stewart LLP, Attn:  Tony Boland for BF Deal Investors, LLC, Two International Place, Boston, Massachusetts 02110 and as of November 15, 2013 was a member of the BondFactor's board of managers.

13.     Upon information and belief, the defendant TV 2010 Fund is a Delaware limited liability company authorized to do and doing business in the State of New York.  TV 2010 Fund's last known principal place of business is TV 2010 Fund, Attn: Gary Coursey, 555 Bryant Street, Palo Alto, California 94301.

### Jurisdiction and Venue

14.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this action occurred in this district.

## FACTUAL ALLEGATIONS

### A.    Fitzgerald was an investor and employee of BondFactor

16.    Fitzgerald simultaneously became an investor and employee of BondFactor on May 2, 2011.  His initial investment in BondFactor was $100,000.  The business objective of BondFactor was to commercialize seven transformational patents awarded by the U.S. Patent and Trademark Office for the bond insurance industry.  Fitzgerald was hired as Managing Director of Capital Markets and on May 9, 2013, he became the Chief of Capital Markets.

17.    Fitzgerald entered into a BondFactor employment agreement ("Employment Agreement") on May 2, 2011.  During Fitzgerald's employment, he was responsible for developing capital market strategies and presentations to investors and rating agencies as well as assisting in the development of financial engineering relating to the municipal insurance product that BondFactor hoped to commercialize.

### B.    Fitzgerald informs BondFactor ombudsman of Butcher's misdeeds

18.    During the latter portion of October 2013, Fitzgerald reasonably believed Butcher was undertaking illegal activities in his role as BondFactor's chief executive officer and board chairman.  Fitzgerald discussed the activities with BondFactor's President, Bradley Wendt ("Wendt") and BondFactor's chief risk officer, Jim Gebhardt ("Gebhardt").

19.    Fitzgerald, Wendt and Gebhardt (collectively "BondFactor Whistleblowers") decided the best course of action was to contact board member Jacobs in his role as a BondFactor ombudsman.

20.    Jacobs was specifically singled out due to:

4

(i) Gebhardt's understanding that Jacobs was chairman of BondFactor's risk sub-committee, and

(ii) Wendt's knowledge that Jacobs was chairman of BondFactor's finance committee and served on BondFactor's audit committee.

21.     The BondFactor Whistleblowers volunteered to meet with ombudsman Jacobs at his suburban home.  Jacobs in turn said he felt the discussion could be handled by phone.

22.     During the ensuing phone call, the BondFactor Whistleblowers briefed ombudsman Jacobs on a litany of Butcher's actions reasonably believed to be either inappropriate or illegal.  The ombudsman phone briefing included a discussion of two alleged security law violations;

(i) Butcher allowing broker-dealer activities to be continually performed by an unlicensed BondFactor employee, and

(ii) Butcher's improper use of investor funds.

23.     The phone call lasted approximately 30 minutes and concluded with ombudsman Jacobs recommending that the BondFactor Whistleblowers take their material concerns directly to Butcher.

**C.     BondFactor Whistleblowers confront CEO Butcher over financial misdeeds**

24.     The BondFactor Whistleblowers met with Butcher on October 21 and 22, 2013 (the "Butcher Intervention").

25.     The Butcher Intervention was initially scheduled for one day, however, the topics' intensity necessitated a second day of discussions.

26.     During the "Butcher Intervention," the BondFactor Whistleblowers confronted Butcher on a multitude of illegal activities they reasonably believed were occurring:

i.   Butcher's improper expenditure of BondFactor investor funds;

ii.  Butcher's uneven treatment of favored employees, including Adrienne Unae ("Unae") who was a known paramour of Butcher;

iii. Butcher replacing cash payments to Unae with an inflated BondFactor salary;[1]

iv.  Butcher hiring for high level positions, unqualified employees with credentials from unaccredited institutions;

v.   Butcher's payment of exorbitant salaries to favored, unqualified employees;

vi.  Butcher's total secrecy regarding and exclusion of Wendt in strategic planning;

vii. Butcher's refusal to share important BondFactor information (including all financial information) with qualified employees including Wendt;

viii. Butcher's possible decision to direct BondFactor to pay finder's fees to BondFactor employee Jane Doe ("Doe") an unlicensed individual acting as a broker-dealer, thereby exposing BondFactor to violations of federal securities law.

27.   After the meeting, Fitzgerald memorialized the meeting and the concerns about Butcher's possible illegal activities in a memorandum to file.

**D.   Retaliation against the BondFactor Whistleblowers**

28.   Approximately three weeks after the BondFactor Whistleblower briefing to ombudsman Jacobs, Defendants voted to terminate Fitzgerald -- without cause -- during the executive committee session of the November 12, 2013 board meeting.

29.   Members of the BondFactor board of managers at the time of Fitzgerald's termination included:  Butcher, Jacobs, Agriss, Gibbs, Coursey, Sherwood, Humber, and Boland (the "BondFactor Board").

---

[1] Unae was the third highest paid BondFactor employee, after Butcher and Wendt.  While traveling on Goldman Sachs company business, Butcher met Chief Administrative Officer Unae in 1995 at Solid Gold, a Ft. Lauderdale gentlemen's club.   At the time, Solid Gold employed Unae as a hostess dancer.

30. At the time of Fitzgerald's termination, Jacobs, Agriss, Gibbs, Coursey, Sherwood, Humber, and Boland were members of the BondFactor Board and had little, or no, interaction or familiarity with Fitzgerald in his capacity of Chief of Capital Markets of BondFactor.

31. In addition, at the time of Fitzgerald's termination, Coursey served in a fiduciary role for TV 2010 Fund. Upon information and belief, TV 2010 Fund's follow-on investment in BondFactor was conditioned on Butcher contemporaneously wiring $170,000 to Coursey for accrued board fees.

32. Upon information and belief, upon hearing of the investment-payment nexus, Wendt told Butcher he needed to escalate to the Board Coursey's potential breach of fiduciary duties owed to TV 2010 Fund. Butcher subsequently reported to Wendt that he had briefed Jacobs on the investment-payment nexus.

33. Regarding the $170,000 in fees solely paid to Coursey with no other board member receiving fees at that time, Jacobs testified: "and I think if you were to review any of the [board] discussions you would find that I was appalled."

34. Butcher and Agriss met with Fitzgerald on November 15, 2013, and presented Fitzgerald with an undated termination letter, effective November 15, 2013.

35. Fitzgerald received no notice or counseling prior to his termination, effective November 15, 2013.

36. Throughout Fitzgerald's tenure at BondFactor, Plaintiff never received a performance review nor countersigned a document signifying positive or negative work performance.

37. The mere existence of a personnel file remains in question since Fitzgerald was

never shown his personnel file.

38.     At or about the same time, Defendants likewise terminated Wendt without cause.

39.     Though Ombudsman Jacobs advocated to the BondFactor executive committee that chief risk officer Gebhardt be terminated, Defendants took no action on Gebhardt's employment status.

40.     Ombudsman Jacobs has testified that he had no recollection as to why Fitzgerald was terminated or which board member recommended that Fitzgerald be terminated.

E.     **The Arbitration**

41.     Fitzgerald submitted a Demand for Arbitration (the "Demand") with the American Arbitration Association ("AAA") on or about February 10, 2014.  Fitzgerald asserted seven claims for relief in the Demand against BondFactor, ButcherMark, and Butcher (collectively the "Arbitration Respondents").

42.     The arbitrator ruled that BondFactor had violated the Fair Labor Standard Act with respect to Fitzgerald's employment and awarded him liquidated damages for payroll compensation as well as attorneys' fees and reimbursement for certain employee expenses that had not yet been paid.

43.     Fitzgerald's arbitration was conducted over five full-day hearing sessions: November 10, 11, 12, 13 and 17, 2014.

44.     Discovery resulted in thousands of pages of information being exchanged between the Arbitration Respondents, claimant Fitzgerald, and claimant Wendt ("Arbitration Discovery").

45.     Arbitration Discovery produced a five-page memo-to-file, proffered by claimant Fitzgerald ("Memo-to-file") verifying the discussion topics of the Butcher Intervention.  Item 11

8

of the Memo-to-file memorialized Fitzgerald's reasonable belief regarding Butcher willfully permitting a non-registered employee to engage in broker-dealer activities.

46.      Arbitration Discovery also confirmed Fitzgerald's reasonable belief that a BondFactor employee, Doe, received a 5% commission on all investor funds she raised.

**F.**   **Filing SEC Form TCR (Tip, Complaint or Referral)**

47.      On February 23, 2016, Fitzgerald and Wendt jointly sent Form TCR to the SEC Office of the Whistleblower.

48.      The SEC Form TCR detailed two federal securities laws violations committed by BondFactor.

**G.**   **The Security Law Violations**

49.      Self-enrichment motivated Defendants to aid and abet the violation of the two federal securities laws summarized below.   If Defendants acknowledged and addressed these federal security law violations, raising new investor funds would have been nearly impossible, placing an end to Butcher's self-enrichment via siphoned funds and Board members' self-enrichment via $10 million of accrued consulting and board fees.

**1.**   **SEC violation #1: Non-registered BondFactor
employee engaging in broker-dealer activities**

50.      Fitzgerald questioned Butcher more than once about whether BondFactor employee Doe received compensation based on a percentage of investor funds she raised and securities she sold ("Finder's Fee").   Butcher's responses to Fitzgerald's inquiries regarding Doe's compensation structure were indefinite and elusive.

51.      A review of FINRA BrokerCheck indicates that Doe is "Not licensed".

52.     In September 2012, Fitzgerald became aware that Wendt had requested that

BondFactor's general counsel, Winston and Strawn, research federal securities laws relating to

Finder's Fees.

53.     Winston & Strawn's cautionary Finder's Fee analysis included a link to the SEC

*Denial of No-Action Request*, addressed to G. Nelson Mackey, Jr., which stated in part:

> A person's receipt of transaction-based compensation in connection with these
> activities is a hallmark of broker-dealer activity.   Accordingly, any person
> receiving transaction based revenue compensation in connection with another
> person's purchase or sale of securities typically must register as a broker-dealer
> or be an associated person of a registered broker-dealer.

54.     Butcher testified during the arbitration proceeding that he received and read the

SEC Denial of No-Action Request.

55.     Between 2011 and 2013, BondFactor payroll records indicate Doe received

$738,103 of "Special Bonus Not Tied To Salary".

56.     The payroll nomenclature "Special Bonus" was used exclusively for Doe and not

applied to any other BondFactor employee or agent.

57.     Ombudsman Jacobs testified during the arbitration proceeding:  "I know that

[Doe] was paid. I don't recall whether that was part of that discussion, but I do have knowledge

that she did get paid. I don't think it was a secret that she got paid based upon what she raised."

58.     BondFactor never produced any operating revenues.  Investor dollars were the

sole source of BondFactor's cash and became the golden goose to Defendants' personal

enrichment schemes.

59.     Pursuant to SEC regulations, Doe's three years of conduct described herein

violated Section 15(a) of the Exchange Act, which requires persons engaged in the business of

effectuating transactions in securities to be registered as a broker or dealer or associated with a registered broker or dealer.

60.     Pursuant to SEC regulations, Defendants aided and abetted a BondFactor employee to engage in the conduct described herein in violation of Section 15(a) of the Exchange Act, which requires persons engaged in the business of effectuating transactions in securities to be registered as a broker or dealer or associated with a registered broker or dealer.

### 2.     SEC violation #2: Butcher siphoned BondFactor investor funds to his personal bank account

61.     Butcher formed ButcherMark prior to the formation of BondFactor. ButcherMark was formed by Butcher and Stephen Mark (deceased) in 2008 to provide advisory services to state and local governments.

62.     According to IRS Form 1065 filings, for the four years ending in 2013, ButcherMark had total sales of $824,000 and an operating loss of $1,526,000.

63.     Not willing to accept ButcherMark's abject failure, Butcher created an elaborate shell game whereby:

(i) BondFactor investors' funds offset all operating losses incurred by ButcherMark,

(ii) Butcher siphoned BondFactor investor funds for his personal use.

64.     Butcher's shell game required three steps to isolate and siphon BondFactor investors' funds:

**Step 1:** BondFactor subscription agreements instructed investors to deposit all funds into a dedicated BondFactor bank account.

**Step 2:** Butcher transferred all BondFactor investors' funds into a ButcherMark account, controlled exclusively by Butcher.

**Step 3:** Butcher in turn, selectively wired BondFactor investors' funds, now resident in

11

the ButcherMark account, to either Butcher's individual or joint personal banking accounts.

65.     Neither the investor disclosure documentation nor the BondFactor investor subscription agreements disclose that Butcher would undertake subsequent (or contemporaneous) funds transfer to the ButcherMark's banking account at TD Bank, an account controlled solely by Butcher.

66.     The above three-step shell game, repeated 101 times, resulted in $3.3 million of BondFactor investors' funds siphoned to Butcher's personal bank accounts.

67.     Additionally, Butcher confiscated $1.5 million of BondFactor investors' funds (deceptively resident in the ButcherMark bank account) to offset ButcherMark's unending financial losses.

68.     Board member Jacobs testified during the arbitration proceeding as to the BondFactor Board's "difficulty" in providing effective fiduciary oversight of chairman and chief executive officer Butcher:

> George fundamentally believes that he has the answer which is why when this event happened [the BondFactor Whistleblowers] the board took as strong action in its direction of George because experience has been that George listens, and says good point, good point, good point, and sort of does what he wants.

69.     Although Butcher testified the aggregate amount of dollars transferred to the ButcherMark bank account was never disclosed to BondFactor investors, Butcher claims a one-page ButcherMark "Services Agreement" with a half page of text allowed him to transfer $3.3 million of investors' funds to his personal bank account (the "Service Agreement").

70.     BondFactor's LLC Agreement requires all related party transactions to be on an "arm-length basis" with "full and adequate disclosure" to the LLC's managers and members.

71.     The Arbitration Discovery produced no BondFactor board minutes containing

authorization by Defendants to make any Service Agreement payments to ButcherMark.

72.     Fitzgerald never received any Service Agreement disclosure or mandatory arms-length calculations, nor is Fitzgerald aware of other investors receiving the same.

73.     BondFactor's chief administrative officer and managerial accountant, Unae, testified during the arbitrating proceeding she did not know any details of the Service Agreement: "I can't articulate that well."

74.     Chief financial officer Harris also testified during the arbitration proceeding she did not know any details of the Service Agreement: "I have not seen the contract and I don't know its contents."

75.     In reference to ButcherMark's $1.5 million operating loss, chief risk officer Gebhardt stated during the arbitration proceeding: "It tells me that they are burning cash."

76.     However, the cash that was "burning" was not cash from Butcher or ButcherMark, but funds clandestinely siphoned from BondFactor investors.

77.     Service Agreement "receipts" totaling $3.3 million were transferred to Butcher's personal bank account.  The Service Agreement receipts were not declared as ButcherMark "Gross receipts or sales" on IRS Form 1065.

78.     Butcher testified during the arbitration proceeding to this and other potentially fraudulent IRS declarations by attempting to foist blame onto his accountant: "I've already testified that I don't prepare the K-1's I don't claim to be an expert in what they say and they are prepared by our accountants."

79.     Stephen Mark owned approximately 11% of ButcherMark; however, all cash distributions were made exclusively to Butcher.

80.     As detailed above, Butcher made material misrepresentations and omissions to BondFactor investors on the true nature of transfers to bank accounts controlled solely by Butcher.  This allowed Butcher to siphon $4.8 million of BondFactor investors' funds for personal use.

81.     By engaging in the deceptive and fraudulent conduct described herein, Butcher violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b) and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5.

82.     The BondFactor Board aided and abetted Butcher's material misrepresentations and omissions to BondFactor investors allowing Butcher's siphoning of $4.8 million of investor funds.

83.     By engaging in the conduct described herein, the BondFactor Board violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q; Section 10(b) of the Exchange Act 15 U.S.C. § 78j(b); and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## H.     Resignation of BondFactor Board Members

84.     Fitzgerald was terminated on November 15, 2013.  At the time of Plaintiff's termination, eight members comprised the BondFactor board of managers:

(i)   George Butcher: Former Goldman Sachs managing director and Palmer & Dodge partner;

(ii)   William Jacobs: Former MasterCard Intl. chief operating officer and Financial Security Assurance chief operating officer;

(iii)   Terry Agriss: Former president of the New York State Environmental Facilities Corp.;

(iv)  John Gibbs: Former Booz Allen Hamilton senior partner;

(v)  Gary Corsey: Tomorrow Ventures managing partner (Eric Schmidt's venture fund);

(vi)  Honorable Peter Sherwood: Acting Justice Supreme Court New York County;

(vii)  Jeff Humber: Former Merrill Lynch South Africa co-chief executive officer; and

(viii)  Tony Bolland: Boston Ventures Investment Partners founding partner.

85.     Based on information and belief, Jeff Humber resigned from the BondFactor Board in 2014 due to material deficiencies in BondFactor's financial reporting.

86.     The most recent BondFactor annual meeting was held on September 8, 2015, ("Annual Meeting").

87.     The Annual Meeting board package disclosed that the sole members remaining on the board were George Butcher and William Jacobs.

88.     The nominated one-year board slate included:  Butcher, Jacobs, Marianne C. Spraggins and Janelle Alexander.

89.     On the day of the board meeting, Marianne C. Spraggins and Janelle Alexander declined their nominations to serve on the BondFactor Board.

90.     As of September 8, 2015, the BondFactor Board was comprised of two members:  Butcher and Jacobs.

## AS AND FOR A CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
### (Violations of the Dodd-Frank Act)

91.     Fitzgerald repeats and realleges paragraphs 1 through 90 as if fully set forth herein.

92.     By their actions set forth above, Defendants have violated Section 922 of the Dodd-Frank Act, which provides in relevant part that:

No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower (i) in providing information to the Commission in accordance with this section or. ... (iii) in making disclosures that are required or protected under the Sarbanes Oxley Act of 2002 (15 U.S.C. 7201 et seq.), this chapter, including section 78j-1(m) of this title, section 1513 (e) of title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission.

93.    At the time of Fitzgerald's termination, Butcher was chairman of the BondFactor board of managers, the chief executive officer of BondFactor.

94.    As set forth above, Butcher actively participated in the adverse employment actions taken against Fitzgerald in retaliation for Plaintiff's whistleblowing activities and is therefore individually liable for the wrongful conduct alleged herein.

95.    At the time of Fitzgerald's termination Jacobs, Agriss, Gibbs, Coursey, Sherwood, Humber, and Boland were members of the BondFactor Board and had full authority over Fitzgerald in his capacity as chief of capital markets for BondFactor.

96.    As set forth above, the BondFactor Board actively participated in the adverse employment actions taken against Plaintiff in retaliation for Fitzgerald's whistleblowing activities and its members are therefore individually liable for the wrongful conduct alleged herein.

97.    As a result of the foregoing, Fitzgerald has suffered damages and is entitled to reinstatement with the same seniority status that Fitzgerald would have had, but for the retaliation; two (2) times the amount of back pay otherwise owed to Fitzgerald, with interest; and compensation for litigation costs, expert witness fees, and reasonable attorneys' fees.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial of all issues.

WHEREFORE, Plaintiff demands judgment against Defendants as follows;

(1)  On the Cause of Action, awarding damages in an amount to be proven at trial but in excess of $2,500,000.

(2)  Awarding the costs and disbursements of this action, including reasonable attorney's fees.

(3)  For such other and further relief as the Court deems just and proper.

Dated:  October 17, 2016

> Respectfully submitted,
>
> HOGAN & CASSELL, LLP
> *Attorneys for Plaintiff, Rick Fitzgerald*
>
> By: _____
>
> Michael Cassell
> 500 North Broadway, Suite 153
> Jericho, New York 11753
> Tel.  (516) 942-4700
> Fax (516) 942-4705
> Email:  mcassell@hogancassell.com